# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 11-3521

Tony W. Robertson, Appellant,

v.

Eric K. Shinseki,
Secretary of Veterans Affairs, Appellee.

On appeal from the Board of Veterans' Appeals

(Decided March 15, 2013)

*Stacey-Rae Simcox*, of Williamsburg, Virginia, for the appellant.

*Will A. Gunn,* General Counsel; *R. Randall Campbell*, Assistant General Counsel; *Edward V. Cassidy, Jr.*, Deputy Assistant General Counsel; and *Penny C. Kahn*, Senior Appellate Attorney, all of Washington, D.C., were on the brief for the appellee.

Before LANCE, BARTLEY, and GREENBERG, *Judges*.

BARTLEY, *Judge*: Tony W. Robertson appeals through counsel an August 1, 2011, Board of Veterans' Appeals (Board) decision denying (1) a motion for revision of a March 1977 VA regional office (RO) decision based on clear and unmistakable error (CUE); and (2) a request to reopen a September 2004 RO decision that denied entitlement to service connection for hearing loss based on the character of Mr. Robertson's discharge. Record (R.) at 3-18. This appeal is timely, and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will affirm the Board's August 2011 decision.

## I. FACTS

Mr. Robertson served on active duty in the U.S. Army from July 1963 to July 1967. R. at 820. In September 1964, he was convicted by a special court-martial of a violation of article 86 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886, for going absent without leave (AWOL) for 39 days from July 1, 1964, to August 9, 1964. R. at 716-17. He was sentenced to be confined at hard labor for three months and to forfeit $50 per month for that period. R. at 716. In

January 1967, Mr. Robertson was convicted by a general court-martial of going AWOL for 313 days, from December 9, 1965, to October 18, 1966. R. at 182. At trial, Mr. Robertson testified that he had absented himself in order to marry a Thai national with whom he had fathered a child and to get a job teaching English to support them. R. at 199-201. As punishment for that offense, he received a bad conduct discharge, had to forfeit all pay and allowances, and was confined at hard labor for one year. R. at 182. Mr. Robertson's DD Form 214, then known as the "Armed Forces of the United States Report of Transfer or Discharge," states that he was discharged "under conditions other than honorable." R. at 820.

In January 1974, Mr. Robertson filed a claim for VA benefits for "defective hearing." R. at 694. In March 1974, the RO issued an administrative decision[1] denying his claim because "the circumstances surrounding [his] discharge from service preclude consideration for any VA benefit." R. at 692. That decision advised Mr. Robertson that he could "request a review of the character of [his] discharge by writing direct to [the] Army Board for Correction of Military Records [(ABCMR)]." *Id*. He did not appeal that decision and it therefore became final.

In April 1976, Mr. Robertson enrolled in the Reconciliation Service Program created by President Gerald Ford with Presidential Proclamation 4313. R. at 243. That program enabled Vietnam-era "draft evaders" and "military deserters" to receive a clemency discharge upon the completion of "a period of alternate service in the national interest, together with an acknowledgment of their allegiance to the country and its Constitution." Proclamation No. 4313, 39 Fed. Reg. 33,293 (Sept. 16, 1974) ("Announcing a Program for the Return of Vietnam Era Draft Evaders and Military Deserters"), *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=4714. However, as President Ford made clear, a "clemency discharge shall not bestow entitlement to benefits administered by the [VA]," but rather was offered as "an act of mercy to bind the Nation's wounds and to heal the scars of divisiveness" from the Vietnam War. *Id*. After satisfactorily completing his alternate service, in July 1976, Mr. Robertson was awarded a clemency discharge. R. at 668. Later that month, the Army issued him a DD Form 215, "Correction to DD Form 214, Report of

---

[1]VA issues "administrative decisions" when adjudicating "issues permanently affecting entitlement to benefits, such as character of discharge or willful misconduct." VA ADJUDICATION PROCEDURES MANUAL REWRITE, pt. III, subpt. v, ch. 1, § A-1(a) (last updated March 30, 2012) [hereinafter M21-1MR].

Separation from Active Duty," which corrected his DD Form 214 by adding to box 30 (entitled "Remarks") "Clemency Discharge issued in recognition of satisfactory completion of alternate service pursuant to Presidential Proclamation No. 4313." R. at 301. In August 1976, Mr. Robertson received a Presidential pardon. R. at 669. According to Mr. Robertson, he personally "delivered evidence of his Clemency Discharge and Presidential Pardon to the RO in 1976." R. at 59.

Shortly thereafter, in early 1977, Mr. Robertson submitted a request for VA to reopen his finally denied claim. R. at 689-90. In March 1977, the RO issued an administrative decision that stated, in its entirety: "This is about your application for compensation or pension. The circumstances surrounding your discharge from service preclude consideration for any [VA] benefit. If you desire, you may request a review of the character of your discharge by writing direct to [the ABCMR]." R. at 688. There is no indication that in making that decision the RO considered the effect of his clemency discharge or Presidential pardon. *See id.* Mr. Robertson failed to appeal that decision and it became final. Following that denial, Mr. Robertson requested a character of discharge upgrade from the ABCMR, which was denied in May 1978. R. at 552-54.

Mr. Robertson attempted to reopen his VA benefits claim in June 1981. R. at 682-85. At that time, he resubmitted copies of his clemency discharge and Presidential pardon to VA. R. at 668-69. In July 1981, the RO issued an administrative decision apparently reopening his claim and denying it on the merits, finding that "[t]he clemency discharge [he] received ha[d] no effect on [the] previous decision."[2] R. at 667. The RO also advised Mr. Robertson that he could request a correction of his military records by the ABCMR and enclosed a form for doing so. *Id.* He did not appeal that decision and it became final.

Mr. Robertson filed additional requests to reopen his claim in 1984, 1991, 1998, 2004 (twice), and 2006. R. at 571-76, 592-99, 601-10, 632, 646, 653-60. In each instance, the RO issued an administrative decision declining to reopen his claim and advising him to seek a character of discharge upgrade before refiling. R. at 569-70 (May 2006 administrative decision), 590-91 (September 2004 administrative decision), 600 (April 2004 administrative decision), 631 (May 1998

---

[2]There is no indication in the decision that the RO found the evidence submitted by Mr. Robertson to be new and material. *See* R. at 667. However, a subsequent administrative decision states that the claim was reopened and denied, apparently on the merits, in July 1981. R. at 236.

administrative decision), 645 (October 1991 administrative decision), 652 (November 1984 administrative decision). The RO explained in the May 2006 administrative decision that "[t]he Clemency Discharge given to you by President Ford was for purposes of avoidance of prosecution. It did not upgrade your discharge for VA benefits purposes." R. at 569. The RO stated that the only new and material evidence that would be sufficient to reopen his claim would be evidence of an upgraded discharge. *Id*. None of the foregoing decisions were appealed and they became final.

The current appeal originated in November 2007, when Mr. Robertson filed another request to reopen his claim. R. at 527. The RO issued a February 2008 administrative decision declining to do so. R. at 499-500. Mr. Robertson filed a timely Notice of Disagreement (NOD) with that decision (R. at 498), but it was returned as premature because the RO decided to reconsider his request (R. at 486).

The RO issued a May 2008 administrative decision that denied reopening and recognized that the ABCMR had previously denied his request for an upgraded discharge. R. at 478-82. The RO appended a copy of Presidential Proclamation 4313 to that decision and directed Mr. Robertson's attention to the highlighted portion, stating that a clemency discharge does not restore potential entitlement to VA benefits. R. at 479 (citing R. at 482). Mr. Robertson attempted to submit another NOD (R. at 477), but was informed in July 2008 that an NOD was premature because VA could not take any further action on his request to reopen until it received the evidence requested in February and May 2008–i.e., evidence that his discharge had been upgraded (R. at 475-76).

The RO issued another administrative decision in October 2008 continuing to deny his request to reopen. R. at 461-63. Attached to that decision was a September 1975 memorandum from the general counsel of the Presidential Clemency Board, which stated:

> The Clemency Discharge is a neutral discharge, issued neither under "honorable" conditions" nor under "other than honorable conditions." It is to be considered as ranking between an Undesirable Discharge and a General Discharge. Such a discharge in and of itself restores no Veterans Benefits. While there is no change in benefit status per se, a recipient may apply to the [VA] for benefits. He may also apply for an upgrade in his original discharge (Undesirable, Bad Conduct, Dishnorable) to the appropriate Discharge Review Board, where the Clemency Discharge should greatly improve the recipient's chances for success. Finally, the Clemency Discharge, like a Presidential Pardon, is an expression by the Chief

Executive that the stigma of a bad record has been removed, and that the bearer of a Clemency Discharge should no longer be discriminated against in his future opportunities.

R. at 468.

Later that month, the RO sent Mr. Robertson a letter recognizing that it had previously erred in not accepting his July 2008 NOD as to the May 2008 decision. R. at 459-60. Accordingly, the RO issued a Statement of the Case (SOC) continuing to deny his request to reopen (R. at 428-58) and Mr. Robertson subsequently perfected his appeal (R. at 417-19).

While his appeal was pending before the Board, Mr. Robertson obtained legal counsel. R. at 391, 407-08. In November 2009, counsel filed a motion for revision of the March 1977 RO decision based on CUE and submitted additional items in support of that motion, most of which had previously been submitted to VA. R. at 154-372. The RO issued a Supplemental Statement of the Case (SSOC) in March 2010 that determined that there was no CUE in the March 1977 RO decision. R. at 147-52. In September 2010, the Board referred Mr. Robertson's CUE motion to the RO for initial adjudication and issuance of a rating decision, and remanded his request to reopen, finding that the two were inextricably intertwined. R. at 69-71.

The RO issued a November 2010 SSOC continuing to deny Mr. Robertson's request to reopen. R. at 110-17. Later that month, the RO denied his CUE motion, concluding that the clemency discharge and Presidential pardon had no effect on his character of discharge. R. at 104-09. Mr. Robertson filed a timely NOD with that decision (R. at 58) and ultimately perfected his appeal (R. at 23-24).

In August 2011, the Board issued the decision currently on appeal, which determined that the March 1977 RO decision did not contain CUE and that Mr. Robertson had not submitted new and material evidence sufficient to reopen his finally denied claim for service connection for hearing loss. R. at 3-18. With respect to his CUE motion, the Board acknowledged that the clemency discharge and Presidential pardon were not of record when the RO made its decision in March 1977, but explained that neither of those documents would have changed Mr. Robertson's character of discharge or removed the bar to benefits based on his willful and persistent misconduct in service. R. at 9-10. The Board therefore concluded that there was no CUE in that decision. R. at 10. With

respect to his request to reopen, the Board found that the evidence added to the record since September 2004–the most recent final denial of reopening–was not material because it did not contain evidence that Mr. Robertson's discharge had been upgraded. R. at 16-17. The Board concluded that, absent such evidence, reopening was not warranted. R. at 17. This appeal followed.

## II. ANALYSIS

### A. CUE

A prior final RO or Board decision must be reversed or revised where evidence establishes CUE. 38 U.S.C. § 5109A(a); 38 C.F.R. § 3.105(a) (2012). CUE exists when (1) "either the facts known at the time were not before the adjudicator or the law then in effect was incorrectly applied," (2) "an error occurred based on the record and the law that existed at the time the decision was made," and (3) "had the error not been made, the outcome would have been manifestly different." *Grover v. West*, 12 Vet.App. 109, 112 (1999) (citing *Damrel v. Brown*, 6 Vet.App. 242, 245 (1994); *Russell v. Principi*, 3 Vet.App. 310, 313-14 (1992) (en banc)). When the Court reviews a Board determination that there was no CUE in a prior final RO decision, the Court's review is limited to determining whether the Board's conclusion in that regard was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and whether it was supported by an adequate statement of reasons or bases. *See Eddy v. Brown*, 9 Vet.App. 52, 57 (1996).

On appeal, Mr. Robertson argues that the Board's determination that the March 1977 RO decision did not contain CUE was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the RO (1) did not make a formal character of discharge determination; and (2) impermissibly considered the 313-day AWOL period that resulted in his conviction by general court-martial and his discharge under other than honorable conditions, which he argues was "blotted" out by receipt of a Presidential pardon. *See* Appellant's Brief (Br.) at 5-6, 10-11, 15-21; Reply Br. at 1-9. In the alternative, he contends that remand is warranted because the Board applied the wrong regulations in determining that his character of discharge was a bar to benefits. *See* Appellant's Br. at 6-9, 21-25. The Court will address each of these arguments in turn.

6

*1. Character of Discharge Determination*

"A person seeking VA benefits must first establish by a preponderance of the evidence that the service member, upon whose service such benefits are predicated, has attained the status of veteran." *Holmes v. Brown*, 10 Vet.App. 38, 40 (1997). "The term 'veteran' means a person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable." 38 U.S.C. § 101(2). If a service member receives an undesirable discharge, a discharge under other than honorable conditions, or a bad conduct discharge, VA is instructed to make a formal character of discharge determination before addressing a claim for benefits on the merits. *See* M21-1MR, pt. III, subpt. v, ch. 1, § B-5(c). If VA determines that the service member was discharged or released under any of the circumstances outlined in 38 U.S.C. § 5303 or its implementing regulation, 38 C.F.R. § 3.12, such benefits are not payable unless VA finds that the service member was insane at the time of committing the offense that precipitated that discharge or release. *See* 38 U.S.C. § 5303(b); 38 C.F.R. § 3.12(b) (2012).

Mr. Robertson received an other than honorable discharge as reflected on his DD Form 214. R. at 182, 820. In July 1976, he received a clemency discharge and was issued a DD Form 215, "Correction to DD Form 214, Report of Separation from Active Duty," which corrected his DD Form 214 by adding "Clemency Discharge issued in recognition of satisfactory completion of alternate service pursuant to Presidential Proclamation No. 4313" to box 30 (entitled "Remarks") of his DD-214. R. at 301, 688. The law extant in March 1977 when he attempted to reopen his claim for VA benefits, like the law in force today, instructed VA adjudicators to make a formal character of discharge determination when presented with a claim for benefits predicated on a service member's other than honorable service. *See* VA ADJUDICATION PROCEDURES MANUAL, ch. 14, subch. I, §§ 14.01(1)(b), (d) (updated Jan. 24, 1977) ([hereinafter M21-1]; M21-1MR, pt. III, subpt. v, ch. 1, § B(5)(c). In March 1974, the RO issued an administrative decision concluding that "[t]he circumstances surrounding [Mr. Robertson's] discharge from service preclude consideration for any VA benefit" and advising him to seek a character of discharge upgrade from the ABCMR. R. at 692. The March 1977 RO decision that Mr. Robertson is attempting to revise based on CUE contains an identical finding. R. at 688. Although the RO did not thoroughly explain in either decision how it

reached its determination that he was precluded from consideration from VA benefits, the law extant at the time of both RO decisions did not require further elaboration. *See Natali v. Principi*, 375 F.3d 1375, 1380 (Fed. Cir. 2004) (explaining that, prior to 1989, an RO did not have to provide a detailed statement of reasons or bases for a decision denying VA benefits).

Moreover, even if the RO had not made a character of discharge determination in March 1977, such a failure would not, in and of itself, constitute CUE. To establish CUE, Mr. Robertson must show, inter alia, that the error by the RO in 1977 would have manifestly changed the outcome of the March 1977 decision. *See Bustos v. West*, 179 F.3d 1378, 1381 (Fed. Cir. 1999) (expressly adopting the "manifestly changed the outcome" language in *Russell* and explaining an error must be "outcome-determinative" to constitute CUE); *see also Grover*, *Damrel*, and *Russell*, all *supra*. However, Mr. Robertson "has never contended . . . that his Clemency Discharge automatically entitles him to benefits," only that it "nullifies and replaces his 'bad conduct discharge'" with a "neutral discharge" and "entitles [him] to a character of discharge review." Reply Br. at 8. In essence, he asserts that he was entitled to more process–i.e., a fully explained character of discharge review–which would not necessarily result in a manifestly different outcome.[3] *Cf. Cook v. Principi*, 318 F.3d 1334, 1344 (Fed. Cir. 2002) ("[A] breach of the duty to assist cannot constitute CUE."). Thus, Mr. Robertson has failed to carry his burden of demonstrating that the March 1977 RO decision was the product of CUE.[4] *See Hilkert v. West*, 12 Vet.App. 149, 151 (1999) (en banc) (holding that the appellant bears the burden of demonstrating error), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

Further, to the extent that Mr. Robertson asserts that the RO failed to provide him with adequate notice before making its character of discharge determination in March 1977 (*see* Appellant's Br. at 10-11, 14), that argument must fail. Such an error would be a violation of VA's

---

[3]Indeed, in July 1981, when the RO expressly considered the effect of Mr. Robertson's clemency discharge and Presidential pardon on his character of discharge, the RO found that they had "no effect on [its] previous decision." R. at 667.

[4]Mr. Robertson does not argue that a request for a character of discharge determination remains pending and unadjudicated by VA since 1977 and, in any event, his CUE challenge presumes the finality of the March 1977 RO decision.

duty to assist or a mere procedural error, which, as a matter of law, cannot constitute CUE. *See Cook*, 318 F.3d at 1344.

### 2. Effect of a Presidential Pardon

Mr. Robertson next argues that the March 1977 RO decision contains CUE because it "considers the 'circumstances surrounding his discharge' and uses those circumstances to deny [him] benefits," even though receipt of the Presidential pardon "require[s] that his offense and subsequent court-martial and discharge may not be used to statutorily bar him from VA benefits." Appellant's Br. at 21. In other words, he asserts that the Presidential pardon not only prevents the VA from considering the legal punishment he received for his offense, the general court martial conviction, but also "blots out" the underlying conduct in his case, i.e., being AWOL for 313 days, such that the RO's consideration of those circumstances in determining eligibility for VA benefits impermissibly encroached on the President's constitutional power to pardon. The Court disagrees.

Mr. Robertson's argument is premised on a line of early U.S. Supreme Court cases interpreting Article II, Section 2 of the U.S. Constitution, which empowers the President to "grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. CONST. art. II, § 2, cl. 1. Specifically, in *Ex parte Garland*, the Supreme Court examined the scope of a Presidential pardon and concluded that it "reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence." 71 U.S. 333, 380 (1866). The Supreme Court further explained that a pardon, "if granted after conviction, . . . removes the penalties and disabilities, and restores [the pardonee] to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity." *Id*. at 380-81. Supreme Court cases decided immediately after *Garland* adhered to this broad formulation, including several cases cited in Mr. Robertson's brief. *See* Appellant's Br. at 17 (citing *Young v. United States*, 97 U.S. 39, 66 (1877) ("The pardon is of the offence, and, as between the offender and the offended government, shuts out from sight the offending act."); *United States. v. Klein*, 80 U.S. 128, 147 (1871) (explaining that a pardon "blots out the offence pardoned and removes all its penal consequences"); *see also Knote v. United States*, 95 U.S. 149, 153 (1877) ("[A

9

pardon] so far blots out the offence, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives to him a new credit and capacity, and rehabilitates him to that extent in his former position.").

However, the U.S. Department of Justice's Office of the Pardon Attorney, the preeminent authority on the exercise of the executive clemency power and the President's chief advisor in that area, *see* OFFICE OF THE PARDON ATTORNEY, U.S. DEP'T OF JUSTICE, ABOUT THE OFFICE, http://www.justice.gov/pardon/about-pardon.html (last visited Mar. 14, 2013), has endorsed a less expansive view of the scope of Presidential pardon, first espoused by Professor Samuel Williston in a seminal 1915 law review article examining *Garland* and its progeny:

> The pardon removes all *legal punishment* for the offence. Therefore if the mere conviction involves certain disqualifications which would not follow from the commission of the crime without conviction, the pardon removes such disqualifications. On the other hand, if character is a necessary qualification and the commission of a crime would disqualify even though there had been no criminal prosecution for the crime, the fact that the criminal has been convicted and pardoned does not make him any more eligible.

Samuel Williston, *Does a Pardon Blot Out Guilt?*, 28 HARV. L. REV. 647, 653 (1915) (emphasis added); *see also Effects of a Presidential Pardon*, 19 Op. O.L.C. 160 (1995). The distinction made by Professor Williston and adopted by the Office of the Pardon Attorney is that a Presidential pardon relieves the pardonee of any legal disabilities that would have attached by virtue of a conviction of an offense, but not the conduct underlying that conviction. *See* Williston*, supra.*

The Supreme Court tacitly retreated from *Garland* and embraced the Williston distinction in later decisions. First, in *Angle v. Chicago, St. Paul, Minneapolis & Omaha Railway Co.*, 151 U.S. 1 (1894), the Supreme Court held that a third party's private right to recover damages from a pardonee remained even after being granted a pardon. The Supreme Court stated that "[a]n executive may pardon and thus relieve a wrongdoer from the *punishment* the public exacts for the wrong, but neither executive nor legislature can pardon a private wrong, or relieve the wrongdoer from civil liability to the individual he has wronged." *Id*. at 19 (emphasis added). By recognizing a private right to action against a pardonee, the Supreme Court dealt the first blow to *Garland*'s broad articulation that a pardon blots out the underlying conduct.

10

The scope of *Garland* was further eroded in *Carlesi v. New York*, 233 U.S. 51 (1914), where the Supreme Court addressed whether prior offenses that had been pardoned could be used to impose harsher sentences under a State habitual-offender law. In that case, the Supreme Court explained that application of the law would be unconstitutional to the extent that it took "into consideration a past *conviction* of an offense committed by the same offender . . . despite a pardon," if it were "in any just sense a punishment for such crime." *Id.* at 57 (emphasis added). However, the Supreme Court held that a pardon does not limit the power to "provide for taking into consideration past offenses committed by the accused as a circumstance of aggravation, even although for such past offenses there had been a pardon granted." *Id.* at 59. In other words, although the pardon removes the legal impediments of a *conviction*, it does not erase the underlying *conduct* that led to that conviction.

The following year, the Supreme Court decided *Burdick v. United States*, 236 U.S. 79 (1915), where it addressed the difference between legislative amnesty and a Presidential pardon. The Supreme Court explained that a pardon "carries an imputation of guilt; acceptance a confession of it," and that a pardon "remits punishment," while an amnesty "overlooks offense." *Id.* at 94-95; *see also Biddle v. Perovich*, 274 U.S. 480, 486 (1927) ("When granted[, a pardon] is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed."). *Burdick* therefore stands in direct opposition to *Garland*, inasmuch as it stated that a pardon protects the pardonee from punishment, but does not reach the conduct or offense that led to the imposition of that punishment in the first place. *Burdick*, 236 U.S. at 94-95. In short, the foregoing cases are irreconcilable with *Garland*'s broad description of the effect of a Presidential pardon, and mark the Supreme Court's departure from the "blotting out" conduct analysis urged by Mr. Robertson in this case.

The Federal circuit courts of appeals that have faced similar arguments have all come to the same conclusion regarding the development of Supreme Court caselaw in this regard. *See In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994) (stating that *Garland's* "expansive view of the effect of a pardon turned out to be dictum" and noting that "*Garland*'s dictum was implicitly rejected in *Burdick*" (citation omitted)); *United States v. Noonan*, 906 F.2d 952, 958 (3d Cir. 1990) (citing

11

*Burdick* and explaining that, "[b]y 1915, . . . the [Supreme] Court made clear that it was not accepting the *Garland* dictum that a pardon 'blots out of existence the guilt'"); *Bjerkan v. United States*, 529 F.2d 125, 128 n.2 (7th Cir. 1975) (explaining that the *Burdick* Court "suggest[ed] that, far from blotting out guilt, the acceptance of a pardon may constitute a confession of guilt," and holding that "[a] pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law as was suggested in *Ex Parte Garland*"); *Groseclose v. Plummer*, 106 F.2d 311, 313 (9th Cir. 1939) (noting that "the great weight of authority support[s] the more realistic view that a pardon, to the extent of its terms, does nothing more than to abolish all restrictions upon the liberty of the pardoned one, and upon his civil rights that follow a felony conviction and a sentence" and stating that "[t]hese principles are conclusively established in the case of *Carlesi*").

Likewise, numerous State courts agree that the Supreme Court has long since abandoned its broad formulation of the effect of a Presidential pardon. *See State v. Peterson*, 369 A.2d 1076, 1080 (Del. 1976) ("If *Garland* ever had the broad impact . . . the sweep of its language implies, a century of judicial sculpturing has left more form than substance to the opinion. It can no longer be seriously contended . . . that a pardon erases an offender's past, making it 'as if he had never committed the offense.'"); *In re Abrams*, 589 A.2d 6, 19 (D.C. 1997) ("At least since 1915, the federal and state courts have uniformly ruled that Professor Williston had it right and that the Supreme Court's use of metaphor in the *Garland* opinion does not compel a contrary conclusion."); *Fletcher v. Graham*, 192 S.W.3d 350, 363 (Ky. 2006) ("[W]hile a pardon will foreclose punishment of the offense itself, it does not erase the fact that the offense occurred, and that fact may later be used to the pardonee's detriment."); *Damiano v. Burge*, 481 S.W.2d 562, 565 (Mo. Ct. App. 1972) ("The fundamental distinction suggested by Professor Williston has been generally accepted and followed by the courts since the date of his article."); *In re Sang Man Shin*, 206 P.3d 91, 97 (Nev. 2009) (concluding that "the U.S. Supreme Court has *sub silentio* retreated from *Garland*'s sweeping articulation of the pardoning power"); *People v. Brophy*, 38 N.E.2d 468, 470 (N.Y. 1941) (explaining that the Supreme Court's "blotting out" language in *Garland* was a "metaphor" used to encourage support for a controversial decision issued "when passions roused by the rebellion still clouded the judgment of

12

most citizens," and determining that "[t]he Supreme Court of the United States, indeed, has itself rejected the implications lurking in the metaphor it used in *Ex parte Garland*"); *State v. Radcliff*, 978 N.E.2d 1275, 1284 (Ohio Ct. App. 2012) (acknowledging that the Supreme Court cases following *Garland* "indicate that a pardon cannot erase past conduct" and noting that "recent case law dismisses *Garland*'s broad articulation of a pardon as dictum"); *State v. Hazzard*, 247 P. 957, 958 (Wash. 1926) (stating that *Garland* "has been robbed of much of its virility by later decisions of the [Supreme Court]").

Accordingly, the Court concludes that the language in *Garland* upon which Mr. Robertson relies has been overtaken by subsequent development in the Supreme Court's own caselaw and, therefore, is not applicable here. Instead, the Court is bound by the Supreme Court's eventual adoption of Professor's Williston's view of the effect of a Presidential pardon–namely, that a Presidential pardon relieves the pardonee of the legal disabilities incident to a conviction of an offense (in this case, the legal punishment of a general court-martial conviction), but does not eliminate the consideration of the conduct (being AWOL for 313 days) that led to that conviction. *See* Williston, *supra*. Therefore, Mr. Robertson's argument, that his Presidential pardon "blots out" the conduct that led to his discharge and prohibits VA from considering that conduct as a bar to benefits, must fail.

### 3. 38 C.F.R. § 3.12

Mr. Robertson also argues that the Board erred in analyzing his CUE motion under 38 C.F.R. § 3.12(d)(4). *See* Appellant's Br. at 21-23. The version of § 3.12(d)(4) in effect when the RO made its decision in March 1977 provided that a discharge due to willful and persistent misconduct was considered to have been issued under dishonorable conditions and therefore was a bar to receiving VA benefits. 38 C.F.R. § 3.12(d)(4) (1977).[5] Mr. Robertson contends that "his discharge was not the result of persistent and willful misconduct, but instead the result of his AWOL over 180 days that has been pardoned by the President of the United States," which he asserts is covered by 38 C.F.R. § 3.12(c)(6). Appellant's Br. at 22. This argument must fail, however, because § 3.12(c)(6) did not exist in March 1977; it was added in April 1978 and made retroactively effective to October 1977,

---

[5]The 1977 version of § 3.12(d)(4) is identical to the one in force today. *See* 38 C.F.R. § 3.12(d)(4) (2012).

eight months after the RO issued the decision that Mr. Robertson is collaterally attacking. *See* Character of Discharge, 43 Fed. Reg. 15,152 (Apr. 11, 1978). Thus, the Board's failure to discuss § 3.12(c)(6) does not constitute error. *See Russell*, 3 Vet.App. at 313 (stating that CUE requires, inter alia, a showing that the "correct facts, as they were known at the time, were not before the adjudicator or the statutory or regulatory provisions *extant at the time* were incorrectly applied" (emphasis added)).

Mr. Robertson contends that "it is obvious that his discharge was not the result of willful and persistent misconduct" because his "discharge from the Army was entirely predicated on the single charged offense of AWOL in his General Court-Martial in 1967, which the Board is not permitted to consider because it has been pardoned by the President of the United States." Appellant's Br. at 22-23. This argument fails for a number of reasons. First, as explained in part II.A.2, *supra*, the Presidential pardon he received did not "blot out" his period of AWOL, and the RO was permitted to consider it in determining whether he was eligible for VA benefits. Second, Mr. Robertson has not demonstrated that the RO was precluded from determining that he engaged in willful and persistent misconduct by being AWOL two times during service, once for 39 days and once for 313 days. Therefore, even though the RO did not cite § 3.12(d)(4) in its March 1977 decision, it potentially stood as a bar to Mr. Robertson's receiving VA benefits. Absent a showing that that bar to benefits was inapplicable, the Court cannot conclude that the Board's determination that the RO denied reopening his claim in March 1977 because § 3.12(d)(4) rendered him ineligible to receive VA benefits was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Eddy*, *supra*; *see also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (explaining that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); *Hilkert*, 12 Vet.App. at 151.

Mr. Robertson next argues that the Board decision on appeal contains error because it cited 38 C.F.R. § 3.12(h) and he has never been awarded an honorable or general discharge sufficient to place him within the ambit of that regulation. Section 3.12(h) provides:

> Unless a discharge review board established under 10 U.S.C. [§] 1553 determines on an individual case basis that the discharge would be upgraded under uniform standards meeting the requirements set forth in paragraph (g) of this section, an

14

honorable or general discharge awarded under one of the following programs does not remove any bar to benefits imposed under this section:

> (1) The President's directive of January 19, 1977, implementing Presidential Proclamation 4313 of September 16, 1974; or
> (2) The Department of Defense's special discharge review program effective April 5, 1977; or
> (3) Any discharge review program implemented after April 5, 1977, that does not apply to all persons administratively discharged or released from active military service under other than honorable conditions.

38 C.F.R. § 3.12(h) (2012). That provision was not in effect in March 1977; like § 3.12(c)(6), it was added in April 1978 and made retroactively effective to October 1977. *See* Character of Discharge, 43 Fed. Reg. at 15,152-54. The Board therefore erred in citing § 3.12(h) in the decision currently on appeal.

That error, however, did not prejudice the Board's adjudication of Mr. Robertson's CUE motion. *See* 38 U.S.C. § 7261(b)(2) (requiring the Court to "take due account of the rule of prejudicial error"). The Board determined that the RO correctly applied the law extant in March 1977, including § 3.12(d)(4), in concluding that "the circumstances surrounding [Mr. Robertson]'s discharge from service precluded consideration for VA benefits." R. at 10. The Board did not rely on § 3.12(h) in reaching that determination, nor did it discuss or apply that provision at any point in its decision. It appears that the Board's single citation to § 3.12(h) was the result of carelessly adding unnecessary boilerplate to its decision and did not impact its analysis in any meaningful way.

The Board's error also does not relieve Mr. Robertson of his burden of demonstrating that his clemency discharge and Presidential pardon would have manifestly changed the outcome of the March 1977 RO decision, which, as explained above, he has failed to do. R. at 304 (September 1975 memorandum from the Presidential Clemency Board entitled "Meaning of a Clemency Discharge," which states that a clemency discharge "in and of itself restores no Veterans Benefits," but "should greatly improve the recipient's chances for success" in a character of discharge review). Thus, the Court concludes that remand is not warranted for the Board to remove its superfluous citation to § 3.12(h) because such a remand would not tangibly benefit Mr. Robertson. *See Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991) (holding that the Court need not order a remand based on a technical

error of law where a remand would unnecessarily impose additional burdens on the Board with no benefit flowing to the veteran).

In light of the foregoing, the Court concludes that the Board's determination that the March 1977 RO decision did not contain CUE was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Eddy*, 9 Vet.App. at 57.

## B. New and Material Evidence

Mr. Robertson also argues that the Board erred in finding that he had not submitted new and material evidence sufficient to reopen his finally denied claim for service connection for hearing loss. *See* Appellant's Br. at 11-14. The crux of his argument is that the evidence he submitted since the last final disallowance in September 2004, including copies of his clemency discharge and Presidential pardon and memoranda from the U.S. pardon attorney, is new and material because it "instruct[s] the VA on what they can and cannot consider when reviewing [his] service record"–namely, "that [his] pardon forces the VA to disregard his conviction and discharge by general court-martial and the misconduct underlying this conviction." *Id*. at 13. However, new argument regarding evidence previously of record does not constitute new and material evidence. *See Untalan v. Nicholson*, 20 Vet.App. 467, 470 (2006); *cf. Routen v. West*, 142 F.3d 1434, 1440 (Fed. Cir. 1998) (holding that "the misapplication of, or failure to apply, a statutory or regulatory burden-shifting presumption does not constitute 'new and material evidence' for the purpose of reopening a claim" because a presumption is not evidence). Even if it did, Mr. Robertson's argument is predicated on the same misunderstanding of the scope of a Presidential pardon that the Court rejected in part II.A.2, *supra*, and he has not asserted that the Board otherwise erred in denying his request to reopen. In light of Mr. Robertson's failure to carry his burden of demonstrating error in that regard, *see Hilkert*, 12 Vet.App. at 151, the Court concludes that the Board's determination that he did not submit new and material evidence sufficient to reopen his finally denied claim for service connection for hearing loss was not clearly erroneous. *See Suaviso v. Nicholson*, 19 Vet.App. 532, 533-34 (2006); *Elkins v. West*, 12 Vet.App. 217 (1999) (en banc).

### III.  CONCLUSION

Upon consideration of the foregoing, the August 1, 2011, Board decision is AFFIRMED.