# United States Court of Appeals
# for the Federal Circuit

---

**TONY W. ROBERTSON,**
*Claimant-Appellant,*

v.

**SLOAN D. GIBSON,**
**Acting Secretary of Veterans Affairs,**
*Respondent-Appellee.*

---

2013-7103

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 11-3521, Judge Margaret C. Bartley.

---

Decided: July 21, 2014

---

NATHAN S. MAMMEN, Kirkland & Ellis LLP, of Washington, DC, argued for claimant-appellant. With him on the brief was RACHEL E. GOLDSTEIN.

MICHAEL P. GOODMAN, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellee. On the brief were STUART F. DELERY, Assistant Attorney General, BRYANT G. SNEE, Acting Director, and SCOTT D. AUSTIN, Assistant Director. Of counsel on the brief were DAVID J. BARRANS, Deputy

Assistant General Counsel, and RACHAEL T. BRANT, Attorney, United States Department of Veterans Affairs, of Washington, DC.

MEGAN F. RAYMOND and PAUL M. SCHOENHARD, Ropes & Gray, LLP, of Washington, DC, for amicus curiae, National Institute of Military Justice.

————————————

Before O'MALLEY and HUGHES, *Circuit Judges.*[*]

HUGHES, *Circuit Judge*.

During the Vietnam War era and after having served a period of confinement for being absent without leave, Tony W. Robertson was discharged from the Army under conditions other than honorable, a character of discharge that can foreclose the receipt of veterans' benefits. He subsequently participated in President Ford's clemency program and received a presidential pardon and a new clemency discharge. Despite his pardon and clemency discharge, the Department of Veterans Affairs has continued to deny Mr. Robertson's claim for veterans' benefits. We must decide whether the presidential pardon precludes the Department of Veterans Affairs from relying on Mr. Robertson's underlying misconduct in making a benefits decision. Because we conclude that the Department of Veterans Affairs properly considered the misconduct underlying his pardoned offense to deny his application for benefits, we affirm.

I

Roughly 13,000 civilians and 100,000 service members committed draft or military absence offenses during

————————————

[*]    Randall R. Rader, who retired from the position of Circuit Judge on June 30, 2014, did not participate in this decision.

the Vietnam War era.  U.S. Presidential Clemency Board, *Report to the President* xi (1975) [hereinafter *PCB Report*], *available at* http://catalog.hathitrust.org/Record/ 002482729.  On September 16, 1974, six weeks after taking office, President Ford announced "a Program for the Return of Vietnam Era Draft Evaders and Military Deserters."  Proclamation 4313, 39 Fed. Reg. 33,293, 33,293–95 (Sept. 17, 1974).  Its stated purpose was "to bind the Nation's wounds and to heal the scars of divisiveness" inflicted upon American society during the Vietnam War.  *Id.* at 33,293.  Accordingly, President Ford declared that Vietnam-era military deserters and draft evaders would be given "the opportunity to earn return to their country, their communities, and their families, upon their agreement to a period of alternate service in the national interest, together with an acknowledgment of their allegiance to the country and its Constitution."  *Id.* The President's program was carefully crafted, recognizing that "[u]nconditional amnesty would have created more ill feeling than it would have eased.  Reconciliation was what was needed, and reconciliation could only [have] come from a reasoned middle ground." *PCB Report* 1.

To help administer the program, President Ford established a Presidential Clemency Board (PCB).  *See* Executive Order 11803, 39 Fed. Reg. 33,297, 33,297–98 (Sept. 17, 1974).  Its role was to advise the President how he should exercise his discretion to grant clemency under Article II, Section 2, of the Constitution.  *Clemency Program Practices and Procedures: Hearings Before the Subcomm. on Admin. Practice and Procedure of the Comm. on the Judiciary*, 93d Cong. 14 (1975) [hereinafter *PCB Hearings*] (statement of Charles E. Goodell, Director, Presidential Clemency Board), *available at* http://catalog.hathitrust.org/Record/003217893.

The PCB was guided by several core principles.  For one, the PCB recognized that the President was granting clemency, not amnesty, and that clemency was to be

determined on a case-by-case basis, not through a categorical approach. *Id.* at 2–3. Accordingly, the PCB made findings and recommendations in each case as to whether the President should grant or deny clemency. Executive Order 11803, 39 Fed. Reg. at 33,297; *see also PCB Report* 3; *PCB Hearings* 42. Among other things, the PCB examined applications for clemency from former servicemen, like Mr. Robertson, who received undesirable discharges for going absent without leave (AWOL) between the date of the Gulf of Tonkin Resolution (August 4, 1964) and the date the last American combatant left Vietnam (March 28, 1973). Executive Order 11803, 39 Fed. Reg. at 33,297; *PCB Report* xi. In total, 13,589 of approximately 90,000 servicemen discharged for AWOL offenses applied. *PCB Report* xiii.

These applicants not only suffered the social stigma and employability problems caused by having a "bad paper" discharge, they also carried a federal felony conviction for violating military law. *PCB Hearings* 15. In part, President Ford addressed these problems by pardoning qualified applicants convicted for AWOL offenses. *PCB Report* 186. But a pardon under the clemency program "result[ed] in no more than a partial restoration of an applicant's records and rights, blotting out neither the fact nor the record of his conviction." *Id.* "The benefits of a pardon [were] its restoration of the right to vote, hold office, hold trade licenses, and enjoy other rights lost or impaired by a felony conviction." *Id.*; *see also* PCB Administrative Procedures and Substantive Standards, 40 Fed. Reg. 12,763, 12,763 (Mar. 21, 1975). In addition, survey evidence suggested that a pardon under President Ford's clemency program would improve employability. *See PCB Report* 186.

The President could also upgrade an applicant's undesirable discharge status at least to a "clemency discharge"—a new type of status created under the program. *Id.* at 13, 186–87, 270. Granting a clemency discharge

was intended to ensure equal employment opportunities and to remove the stigma of a bad record. *Id.* at xii, 78, 186–87, 276. It did not confer veterans' benefits. Proclamation 4313, 39 Fed. Reg. at 33,295; PCB Administrative Procedures and Substantive Standards, 40 Fed. Reg. at 12,763; *PCB Report* xii, 186–87. Nor did it preclude benefits. A clemency discharge was a neutral discharge issued "neither under 'honorable' conditions nor under 'other than honorable' conditions." *PCB Report* 13. Accordingly, applicants remained eligible to seek veterans' benefits from the Department of Veterans Affairs and to appeal if the VA denied those benefits. *Id.* Applicants also remained eligible to seek further upgrades to their discharge statuses from the appropriate military review boards. *Id.*

Although the program generally had no direct effect on an applicant's eligibility for veterans' benefits, the President specifically granted veterans' benefits in about eighty particularly meritorious AWOL cases (approximately 0.6% of all AWOL cases). *Id.* at 140. These applicants had, at a minimum, creditable service and one or more tours in Vietnam. They were typically decorated soldiers who had been wounded or disabled in combat or whose absences could be excused in light of extraordinary emotional trauma experienced during combat. *See id.* For the vast majority of applicants, however, the President did not anticipate that the clemency discharge and presidential pardon would provide entitlement to veterans' benefits.[1] *See, e.g.*, PCB Administrative Procedures

---

[1] Much later, on his last day of office, President Ford directed the armed forces to provide benefits for "former service members who were wounded in combat or who received decorations for valor in combat in Vietnam and who applied to the clemency program." Memorandum from Gerald R. Ford, President of the United States,

and Substantive Standards, 40 Fed. Reg. at 12,763; *PCB Hearings* 17.

## II

Mr. Robertson voluntarily enlisted in the Army in July 1963. He was originally stationed in Germany, where he suffered hearing loss while working with large artillery. Medical professionals in Germany evaluated Mr. Robertson's condition and sent him back to the United States for further treatment.

Following brief hospitalization for his injuries in May 1964, the Army issued Mr. Robertson a hearing aid and ordered him to report to Fort Lee. When he failed to report for duty, the Army dropped him from its rolls. Mr. Robertson turned himself over to the authorities and pleaded guilty to being AWOL for 39 days. He was convicted by a special court-martial of violating Uniform Code of Military Justice Article 86, 10 U.S.C. § 886. For that offense, the Army sentenced Mr. Robertson to three months of hard labor and ordered him to forfeit $50 per month during that period.

In March 1965, the Army reassigned Mr. Robertson to Korat, Thailand, to serve as a warehouseman. There, sometime around September 1965, he conceived a child

---

to the Secretary of the Army, Secretary of the Air Force, and Secretary of the Navy (Jan. 19, 1977), *available at* http://www.presidency.ucsb.edu/ws/?pid=5576. Congress responded several months later with legislation "to deny entitlement to veterans' benefits to certain persons who would otherwise become so entitled" due to President Ford's directive. Pub. L. No. 95-126, 91 Stat. 1106, 1106 (1977) (codified as amended at 38 U.S.C. § 5303(e)(1)); *see also* Character of Discharge, 43 Fed. Reg. 15,152, 15,154 (Apr. 11, 1978) (codified as amended at 38 C.F.R. § 3.12(h)(1)).

with a Thai woman named No Lee. Mr. Robertson allegedly requested permission to marry Ms. Lee and to bring her to the United States. According to Mr. Robertson, however, his superior denied his request, threatening to strip him of his rank and to confine him to a stockade in Okinawa, Japan.

Mr. Robertson went AWOL from his post in Korat in December 1965. According to him, he thought that going AWOL was the only way to "make things right with [his] child and [the child's] mother." J.A. 221–22, 600. During his absence, Mr. Robertson joined Ms. Lee's family in Thailand and took a job teaching English at a Thai school. Military police eventually apprehended him in October 1966. He had been AWOL for 313 days.

In January 1967, Mr. Robertson was tried and convicted by a general court-martial. As punishment, he received a bad-conduct discharge. He was also sentenced to hard labor for one year and ordered to forfeit his pay and allowances during that time. Mr. Robertson served his time at Fort Leavenworth and was discharged "Under Conditions Other Than Honorable" in July 1967.

In January 1974, prior to the announcement of President Ford's clemency program, Mr. Robertson filed a claim for veterans' benefits for his hearing loss. The VA denied his claim because "[t]he circumstances surrounding [his] discharge from service preclude[d] consideration for any VA benefit." J.A. 714. The VA advised Mr. Robertson to appeal his discharge status to the Army Board for Correction of Military Records (ABCMR).

In November 1975, Mr. Robertson inquired about participation in President Ford's clemency program. The Selective Service advised him that to be eligible for a "full pardon" he would have to work 40 hours per week for 3 months, 30 hours per week for 4 months, or 20 hours per week for 6 months. Mr. Robertson enrolled in the program and completed his period of alternative service by

working at a landfill. He received a clemency discharge on July 23, 1976, "in recognition of [his] satisfactory completion of alternate service pursuant to Presidential Proclamation 4313." J.A. 198. On August 16, 1976, Mr. Robertson also received a "full pardon pursuant to an executive grant of conditional clemency . . . in furtherance of Presidential Proclamation 4313." J.A. 620.

After receiving his clemency discharge and pardon, Mr. Robertson reapplied for veterans' benefits in late 1976. The VA again determined that "[t]he circumstances surrounding [his] discharge from service preclude[d] consideration for any [VA] benefit." J.A. 268. That determination became final. Mr. Robertson then sought an upgrade in discharge status from the ABCMR, which denied his request in May 1978.

In 1981, Mr. Robertson tried to reopen his claim for veterans' benefits. The VA obtained copies of his clemency discharge and pardon but again denied his claim, stating that "[t]he clemency discharge you received has no effect on our previous decision." J.A. 689. Over the next 25 years, Mr. Robertson renewed his claim five more times—in 1984, 1991, 1998, 2004, and 2006—each time with the same result. He did not appeal any of those decisions, and they all became final.

In November 2007, Mr. Robertson filed yet another request to reopen his claim, which the VA again denied. This time, Mr. Robertson filed a notice of disagreement, and the VA eventually issued a statement of the case.

With his case reopened, Mr. Robertson argued to the Board of Veterans' Appeals that the VA committed clear and unmistakable error by denying his 1974 application for veterans' benefits. In Mr. Robertson's view, the VA was precluded from relying on his AWOL conviction and consequent discharge to deny his application for benefits because his pardon "blotted out" the offense. *See* J.A.

183–85 (citing *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1871)).

The Board denied Mr. Robertson's claim, and he appealed to the Court of Appeals for Veterans Claims. The Veterans Court affirmed, concluding that the "broad formulation" of the President's pardoning power advanced by Mr. Robertson was "premised on a line of early U.S. Supreme Court cases" and no longer applied. *Robertson v. Shinseki*, 26 Vet. App. 169, 176–79 (2013). Thus, according to the Veterans Court, "the legal punishment of a general court-martial conviction . . . d[id] not eliminate the consideration of the conduct (being AWOL for 313 days) that led to that conviction." *Id.* at 179. Mr. Robertson appeals the Veterans Court's decision.

## III

In this case, we must decide whether the clemency discharge and presidential pardon received by Mr. Robertson remove any potential bar to benefits caused by the misconduct that led to his discharge under other than honorable conditions.

Eligibility for veterans' benefits is conditioned on a discharge or release "under conditions other than dishonorable." 38 U.S.C. §§ 310, 331 (1976); 38 C.F.R. § 3.12(a) (1976). An "honorable" discharge is binding on the VA and entitles a veteran to benefits. 38 C.F.R. § 3.12(a), (e) (1976). With respect to less than honorable discharges, however, the VA must make a factual determination as to whether a veteran was discharged under conditions other than dishonorable. *See generally id.* § 3.12. For example, veterans found to have been discharged or released for conscientious objection, desertion, or by reason of a sen-

tence of a general court-martial are generally not eligible for benefits.[2] *Id.* § 3.12(c).

In this case, Mr. Robertson received a clemency discharge, which is a neutral discharge issued "neither under 'honorable' conditions nor under 'other than honorable' conditions." *PCB Report* 13. Accordingly, the VA was required to determine whether Mr. Robertson was discharged under conditions other than dishonorable. And, based on Mr. Robertson's service record, the Board concluded that "the circumstances surrounding the appellant's discharge from service precluded consideration for VA benefits." J.A. 32. The Board further noted that "neither the Clemency Discharge nor Full Presidential Pardon changes the appellant's character of discharge, which is the pivotal issue at hand." J.A. 31.

Mr. Robertson asserts that "[t]his case is about what it means to be pardoned." Appellant's Br. 1. He contends that his receipt of a "full" pardon and clemency discharge prohibited the VA from considering his 1967 AWOL offense and consequent discharge when reviewing his application for veterans' benefits. We disagree.

Contrary to Mr. Robertson's assertion, this case is not about what it means, generally, to be pardoned. This case is about what Mr. Robertson's specific pardon means in this specific context of veterans' benefits. *See Ex parte Wells*, 59 U.S. (18 How.) 307, 310 (1855) ("Such a thing as

---

[2]    Although not applicable at the time of the VA's decision in March 1977, effective October 8, 1977, the VA added that those "discharge[d] under other than honorable conditions issued as a result of an absence without official leave (AWOL) for a continuous period of at least 180 days" are generally not eligible for benefits. Character of Discharge, 43 Fed. Reg. 15,152, 15,153–54 (Apr. 11, 1978) (codified as amended at 38 C.F.R. § 3.12(c)(6)).

a pardon without a designation of its kind is not known in the law. . . . [E]very pardon has its particular denomination."). Because it is central to resolution of this case, we quote the pardon in its entirety:

> Gerald R. Ford President of the United States of America has this day issued unto Tony Wilson Robertson a full pardon pursuant to an executive grant of conditional clemency on the thirty-first day of October 1975 made subject to the performance of certain conditions which have been fulfilled, and has designated, directed and empowered the attorney general as his representative to sign this grant of executive clemency, in furtherance of Presidential Proclamation 4313 of September 16, 1974, to the above who received either a punitive or an undesirable discharge from service in the Armed Forces of the United States for having violated Article 85, 86, or 87 of the Uniform Code of Military Justice between August 4, 1964 and March 28, 1973, inclusive.

> In accordance with these instructions and authority I have signed my name and caused the seal of the Department of Justice be affixed below and affirm that this action is the act of the President being performed at his direction. Done at the City of Washington, District of Columbia this sixteenth day of August 1976 by direction of the President.

> [Signed by Edward H. Levi, Attorney General].

J.A. 620.

Mr. Robertson relies heavily on the fact that the document contains the phrase "full pardon."[3] Based on that,

---

[3]  Mr. Robertson suggests that his pardon was limited only by "certain conditions which have been fulfilled."

he cites to a line of authority suggesting the VA is precluded from relying on any of his pardoned misconduct to deny his claim for veterans' benefits. The VA responds with its own interpretation of that line of authority. It argues that, even in the context of a full pardon, the VA may consider the underlying misconduct and character of discharge when determining eligibility for benefits. We need not resolve that dispute, however, because we conclude that the language of the pardon itself requires it to be read in the context of President Ford's program. And when read in the context of that program, Mr. Robertson's pardon does not preclude the VA from considering the conduct underlying his less than honorable discharge.

We begin by examining the plain language of Mr. Robertson's pardon, giving the words their ordinary meaning. *Cf. Moskal v. United States*, 498 U.S. 103, 108 (1990) ("'In determining the scope of a statute, we look first to its language,' giving the 'words used' their 'ordinary meaning.'" (citations omitted)). Despite using the phrase "full pardon," the remainder of the document contains two limiting phrases. It notes that it is "pursuant to an executive grant of conditional clemency" and later references a "grant of executive clemency, *in furtherance of President Proclamation 4313* of September 16, 1974." J.A. 620 (emphasis added). Those two references strongly suggest that Mr. Robertson's "full pardon" must be read in the context of the clemency program described by Presidential Proclamation 4313. Accordingly, we cannot read the pardon in a vacuum, as Mr. Robertson suggests. We must also look to the nature and purpose of the pardon,

---

J.A. 620. In his view, the pardon having been granted "in furtherance of Proclamation 4313" merely authorized the Attorney General to sign the pardon on the President's behalf. Accordingly, Mr. Robertson asserts that his "full pardon" is not limited in any way.

namely, President Ford's clemency program. *Cf. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (examining the underlying purposes of the Lanham Act to help interpret a statute enacted under that Act); *Moskal*, 498 U.S. at 114 (interpreting a statute based on the "plain meaning of [its] words" and the "legislative purpose underlying them").

When read in context, there can be little doubt that Mr. Robertson's pardon was intended to have limited effect with respect to his entitlement to veterans' benefits. *See, e.g.*, PCB Administrative Procedures and Substantive Standards, 40 Fed. Reg. at 12,763 ("The Veterans Administration and other agencies may extend veterans' benefits to some holders of a Clemency Discharge, but it is contemplated that most will not receive veterans benefits."); *PCB Report* 162 ("A special upgrade panel was created to make unnecessary the referral to the full Board of cases involving recommendations for veterans' benefits. This upgrade referral rate came to be roughly three percent of the total."); *PCB Hearings* 17 ("The bulk of these cases overwhelmingly would not receive veteran's benefits and the board would not recommend that they do."). The very rare instances in which the President did provide veterans' benefits to clemency program applicants often involved decorated soldiers who had been wounded, disabled, or traumatized in combat. *See PCB Report* 140. Mr. Robertson was not such an applicant and did not receive veterans' benefits.

Mr. Robertson's pardon does not change that result. In the PCB's view, "[a] pardon d[id] not change history, and it d[id] not compensate for any rights or benefits, legal or economic, that the individual had already lost." *PCB Report* 12; *see also Ex parte Garland*, 71 U.S. (4 Wall.) 333, 381 (1866) ("[T]o exclude [a pardoned individual], by reason of [his] offence, from continuing in the enjoyment of a *previously acquired right*, is to enforce a punishment for that offence notwithstanding the pardon."

(emphasis added)).   Mr. Robertson had not previously acquired any right to veterans' benefits at the time of his pardon.  In fact, whether Mr. Robertson might have been eligible for veterans' benefits absent his 1967 AWOL conviction is entirely speculative because he had nearly a year remaining on his term of service at the time of his discharge.

The position Mr. Robertson advocates would effectively turn President Ford's clemency program on its head.  Entitlement to veterans' benefits under the program was meant to be the exception, not the rule.  The President provided benefits to AWOL offenders in only about 0.6% of all AWOL cases by upgrading their discharge statuses.  *See PCB Report* 140.   Although the President left the remaining 99.4% of applicants with the same rights that were available to them before being pardoned, such as the right to apply to the VA for benefits, *see PCB Report* xii, 13, "it [wa]s contemplated that most w[ould] not receive veterans benefits," PCB Administrative Procedures and Substantive Standards, 40 Fed. Reg. at 12,763; *see also PCB Hearings* 16–17; Memorandum from Gerald R. Ford, President of the United States, to the Secretary of the Army, Secretary of the Air Force, and Secretary of the Navy (Jan. 19, 1977) [hereinafter Armed Forces Memorandum], *available at* http://www.presidency.ucsb.edu/ws/?pid=5576 (requesting veterans' benefits for additional participants in his clemency program, but only for those who had been wounded in combat or who had received decorations for valor in combat).

Under Mr. Robertson's view, however, entitlement to benefits under the President's clemency program would have been the rule, not the exception.  Most applicants would have been entitled to veterans' benefits because, if not for their AWOL offenses, their service records generally would not have justified a negative character of discharge determination that would have supported a denial of benefits.  Moreover, if Mr. Robertson's view were

correct, the President would not have singled out particularly deserving applicants to receive veterans' benefits under his clemency program.  Nor would he have later requested that veterans' benefits be given to individuals who had been wounded in combat or who had received decorations for valor in combat.  *See* Armed Forces Memorandum.

Nevertheless, pardoned individuals, like Mr. Robertson, remained eligible to apply for benefits from the VA and to appeal if the VA denied their applications.  *PCB Report* 13.  Similarly, applicants remained eligible to seek further upgrades to their discharge statuses from the appropriate military review boards.  *Id.*; *see also* 10 U.S.C. § 1552 (1970).  In fact, Mr. Robertson sought such an upgrade, but the ABCMR noted that "his record of service . . . did not meet the standards of acceptable conduct and performance of duty for Army personnel for the Board to grant his current request."  J.A. 574.

## IV

In view of the foregoing, Mr. Robertson's pardon did not preclude the VA from considering his 1967 AWOL conviction and consequent discharge when determining that he was not entitled to veterans' benefits.  The decision of the Veterans Court is therefore affirmed.

**AFFIRMED**

No costs.