Citation Nr: 1513888 
Decision Date: 03/31/15 Archive Date: 04/03/15

DOCKET NO. 10-44 502 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Detroit, Michigan


THE ISSUES

1. Entitlement to an initial evaluation in excess of 50 percent prior to September 29, 2014 and in excess of 70 percent beginning September 29, 2014 for posttraumatic stress disorder (PTSD).

2. Entitlement to an increased initial evaluation for headaches, rated as 10 percent disabling from August 30, 2006 to January 2, 2011, as 30 percent disabling from January 3, 2011 to December 17, 2014, and as 0 percent disabling beginning December 18, 2014.

3. Entitlement to a total disability rating based on individual unemployability due to service-connected disability (TDIU).


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


ATTORNEY FOR THE BOARD

J. W. Loeb, Counsel


INTRODUCTION

The Veteran has verified active duty service from November 1965 to October 1967. 

This case originally came before the Board of Veterans' Appeals (Board) on appeal of a March 2009 rating decision of the Department of Veterans Affairs (VA) Regional Office in Detroit, Michigan (RO), which granted entitlement to service connection for PTSD, 50 percent disabling, and granted entitlement to service connection for tension-type headaches, 0 percent disabling. Both disability evaluations were effective on August 30, 2006. The Veteran timely appealed the assigned ratings. A February 2014 rating decision granted a 10 percent rating for headaches effective August 30, 2006 and a 30 percent rating effective January 3, 2011. This case was remanded by the Board in October 2014 for VA examinations, which were conducted in December 2014. A February 2015 rating decision granted a 70 percent rating for PTSD, effective September 29, 2014, and reduced the 30 percent rating for headaches to 0 percent, effective December 14, 2014.

Consequently, there has been substantial compliance with the October 2014 remand instructions. Stegall v. West, 11 Vet. App. 268 (1998) (Holding that a remand by the United States Court of Appeals for Veterans Claims (Court) or the Board confers on the Veteran or other claimant, as a matter of law, the right to compliance with the remand orders). 

The Court has held that a request for TDIU, whether expressly raised by a Veteran or reasonably raised by the record, is not a separate claim for benefits, but rather involves an attempt to obtain an appropriate rating for a disability or disabilities, either as part of the initial adjudication of a claim, or, if the disability upon which entitlement to TDIU is based has already been found to be service connected, as part of a claim for increased compensation. Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). Consequently, the issue of entitlement to a TDIU, which was denied by rating decision in February 2015, is part of the current appeal.

The issue of entitlement to TDIU is REMANDED to the AMC/RO. VA will notify the appellant if further action is required.


FINDINGS OF FACT

1. Prior to September 29, 2014, the Veteran's PTSD has resulted in occupational and social impairment with reduced reliability and productivity; it has not resulted in symptomatology indicative of occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.

2. Since September 29, 2014, the Veteran's PTSD is productive of functional impairment comparable to social and occupational impairment with deficiencies in most areas, without demonstration by competent medical, or competent and credible lay evidence, that such manifestations approximate total occupational and social impairment due to psychiatric symptomatology at any time during the rating period on appeal. 

3. The evidence of record prior to January 3, 2011 and beginning December 18, 2014 shows headache symptomatology equivalent to characteristic prostrating attacks averaging one in two months over the last several months but does not show characteristic prostrating attacks occurring on an average once a month over the last several months.

4. The evidence of record from January 3, 2011 to December 17, 2014 shows headache symptomatology that more nearly approximates very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability.



CONCLUSIONS OF LAW

1. The criteria for the assignment of an initial evaluation in excess of 50 percent prior to September 29, 2014 for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5103A, 5107 (West 2002 & Supp. 2009); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9411 (2014). 

2. The criteria for the assignment of an initial evaluation in excess of 70 percent beginning September 29, 2014 for PTSD have not been met. 38 U.S.C.A. §§ 1155, 5103A, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9411 (2014). 

3. The criteria for the assignment of an initial evaluation in excess of 10 percent for headaches prior to January 3, 2011 are not met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.21, 4.124a, Diagnostic Code 8100 (2010).

4. The criteria for the assignment of an initial evaluation of 50 percent, but no higher, for headaches from January 3, 2011 through December 17, 2014 are met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.21, 4.124a, Diagnostic Code 8100 (2014).

5. The criteria for the assignment of an initial evaluation of 10 percent, but no higher, for headaches beginning December 18, 2014 are met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.3, 4.7, 4.21, 4.124a, Diagnostic Code 8100 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duty to Notify and Assist

The Board has considered the Veterans Claims Assistance Act of 2000 (VCAA). See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2002 and Supp. 2014). The regulations implementing VCAA have been enacted. See 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2014). 
VA has a duty to notify the claimant of any information and evidence needed to substantiate and complete a claim. 38 U.S.C.A. §§ 5102, 5103. See also Quartuccio v. Principi, 16 Vet. App. 183 (2002). After having carefully reviewed the record on appeal, the Board has concluded that the notice requirements of VCAA have been satisfied. 

The notice and assistance provisions of VCAA should be provided to a claimant prior to any adjudication of the claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004). In this case, the RO sent the Veteran a letter in August 2007, prior to adjudication, which informed him of the requirements needed to establish entitlement to service connection. Service connection was subsequently granted for PTSD and headaches by rating decision in March 2009. 

Although the Veteran was not notified of the requirements to establish entitlement to an increased rating until later, the VA General Counsel has held that 38 U.S.C.A. § 5103(a) does not require VA to provide notice of the information and evidence necessary to substantiate newly raised or "downstream" issues, such as the claims for increased compensation following the initial grant of service connection for a disability, in response to notice of its decision on a claim for which VA has already given the appropriate section 5103(a) notice. See VAOPGCPREC 8-2003 (Dec. 22, 2003). The appropriate notice has been given in this case with respect to the increased rating claim on appeal.

The August 2007 letter informed the Veteran of what evidence and information he was responsible for, and the evidence that was considered VA's responsibility. In compliance with the duty to notify, the Veteran was informed in the letter of the criteria for assignment of an effective date. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). 

VCAA also requires VA to provide a medical examination when such an examination is necessary to make a decision on the claim. 38 U.S.C.A. § 5103A(d); 38 C.F.R. § 3.159, see also McLendon v. Nicholson, 20 Vet. App. 79 (2006). There are several pertinent VA evaluations of the Veteran's PTSD and headaches on file, with the most recent in December 2014. When VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The Board finds that the VA examinations in this case are adequate, as they provide the symptomatology of the disabilities at issue. The Board concludes that all available evidence has been obtained and that there is sufficient medical evidence on file on which to make a decision on the issues decided herein. Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion on the issues on appeal has been met. 38 C.F.R. § 3.159(c)(4). 

The Veteran has been given ample opportunity to present evidence and argument in support of his claims. The Board additionally finds that general due process considerations have been complied with by VA, and the Veteran has had a meaningful opportunity to participate in the development of the claims. Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006); 38 C.F.R. § 3.103 (2007). 


Analysis of the Claims

The Veteran seeks increased ratings for his service-connected PTSD and headaches.

Disability evaluations are determined by the application of VA's Schedule for Rating Disabilities (Schedule). 38 C.F.R. Part 4 (2014). The percentage ratings contained in the Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and the residual conditions in civil occupations. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 3.321(a), 4.1 (2014). Separate diagnostic codes identify the various disabilities.

In considering the severity of a disability it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41 (2014). Consideration of the whole recorded history is necessary so that a rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). 

In Fenderson v. West, 12 Vet. App. 119 (1999), it was held that evidence to be considered in the appeal of an initial assignment of a rating disability was not limited to that reflecting the then current severity of the disorder. In Fenderson, the Court also discussed the concept of the "staging" of ratings, finding that, in cases where an initially assigned disability evaluation has been disagreed with, it was possible for a Veteran to be awarded separate percentage evaluations for separate periods based on the facts found during the appeal period. 

The Board must determine the value of all evidence submitted, including lay and medical evidence. Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). The evaluation of evidence generally involves a 3-step inquiry. First, the Board must determine whether the evidence comes from a "competent" source. The Board must then determine if the evidence is credible, or worthy of belief. Barr v. Nicholson, 21 Vet. App. 303 (2007) (Observing that once evidence is determined to be competent, the Board must determine whether such evidence is also credible). The third step of this inquiry requires the Board to weigh the probative value of the proffered evidence in light of the entirety of the record. 

When, after careful consideration of the evidence, a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the claimant. 38 C.F.R. § 4.3 (2014).

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2014). 

It is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances. 38 C.F.R. § 4.21 (2014).

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the diagnosis and demonstrated symptomatology. See Butts v. Brown, 5 Vet. App. 532 (1993).


PTSD

Service connection for PTSD was originally granted by rating decision in March 2009, and a 50 percent evaluation was assigned effective August 30, 2006, the date of claim. A 70 percent rating was assigned by rating decision in February 2015, effective September 29, 2014.

Under the rating schedule, a 50 percent evaluation is assignable for psychiatric disability when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (for example, retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2014).

A 70 percent evaluation is assignable for psychiatric disability when there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. Id.
A 100 percent evaluation for psychiatric disability is assignable for total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id. 

The global assessment of functioning (GAF) score reflects the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995); see also Richard v. Brown, 9 Vet. App. 266, 267 (1996). A GAF score of 21 to 30 involves behavior that is considerably influenced by delusions or hallucinations or involves a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). A GAF score of 31 to 40 involves some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifter) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). 

A GAF of 51 to 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF of 61 to 70 is defined as mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships. A GAF of 71 to 80 is assigned when symptoms, if present, are transient and are expected reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), with no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). See DSM-IV. 

VA treatment records for June 2008 reveal a GAF score of 47.

It was noted on VA evaluation in June 2008 that the Veteran had been a real estate appraiser for the past 20 years. He reported an exaggerated startle response and intrusive thoughts of the Vietnam War; he preferred to be alone. His mood was described as depressed and anxious, and his affect was blunted. PTSD was diagnosed, and the GAF score was 50. 

According to a private psychiatric evaluation by W. D. MacInnes, Ph.D., in July 2008, the Veteran worked 40 hours per week as a real estate appraiser. His problems included insomnia, depression, irritability, memory, and concentration. His wife indicated that he just sat around the house and did not want to do anything. The diagnoses were PTSD; rule out major depression versus organic mood disorder; and possible sleep disorder, rule out sleep apnea.

On VA evaluation in August 2008, the Veteran reported insomnia, crying spells, frustration, moodiness, irritability, nightmares, and depression. It was noted that he had been married three times. He was living with his wife and working as a self-employed real estate appraiser. He did not have any social life. On mental status evaluation, the Veteran was well oriented and his thought processes were logical and goal oriented. He reported being tense and anxious but denied panic attacks. He maintained good personal hygiene. PTSD was diagnosed, and the GAF score was 65.

VA treatment records for January 2009 contain a GAF score of 50. April 2013 contain the diagnoses of PTSD; major depressive disorder, single episode, moderately severe; panic disorder with agoraphobia; and dysthymic disorder, by history. PTSD was diagnosed in March 2014, with a GAF score of 60; it was reported that he continued to have nightmares.


A VA TBI evaluation was conducted in January 2011. It was noted that the Veteran was a real estate appraiser who worked part-time. He had lost approximately six weeks in the previous year from work due to his headaches because they got so bad that he could not function. 

On VA psychiatric evaluation in December 2014, PTSD was diagnosed. The examiner concluded that the Veteran's psychiatric symptoms resulted in occupational and social impairment with reduced reliability and productivity. He was working part-time as a self-employed real estate appraiser and he helped his wife manage a bar. The Veteran's psychiatric symptoms were depression, anxiety, insomnia, impairment of short and long-term memory, disturbances of motivation and mood, difficulty in establishing and maintaining effective work and social relationships, difficulty adapting to stressful circumstances, and impaired impulse control. General behavioral observations included that the Veteran was friendly, cooperative, well oriented, without delusions, hallucinations, or evidence of obsessive rituals.

A Veteran need not demonstrate the presence of all, most, or even some, of the symptoms listed as examples in the rating criteria. See Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). However, as the United States Court of Appeals for Veterans Claims (Court) held in Mauerhan, without the examples noted in the rating criteria, differentiating a 50 percent evaluation from a 70 percent evaluation would be extremely ambiguous. The Board is to consider all symptoms of a Veteran's condition that affect the level of occupational and social impairment, including, if applicable, those identified in the DSM-IV. If the evidence demonstrates that a Veteran suffers symptoms or effects that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the diagnostic code, the appropriate equivalent rating should be assigned. Id. While symptomatology should be the primary focus when deciding entitlement to a given disability rating, § 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused the requisite occupational and social impairment. See Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013). 

A rating in excess of 50 percent is not warranted prior to September 29, 2014. On mental status evaluation in August 2008, the Veteran maintained good personal hygiene, he was well oriented, and his thought processes were logical and goal oriented. Although GAF scores were 47 and 50 in June 2008 and 50 in January 2009, his scores were 65 on VA evaluation in August 2008 and 60 in March 2014, indicative of mild to moderate symptoms. Despite the notation that the Veteran stayed home and did not want to do anything, the evidence indicates that he was employed at least part-time as a real estate appraiser throughout this period. In fact, the veteran indicated on VA TBI evaluation in January 2011 that he was working part-time and that he had lost time from work because of his headaches; there is no evidence that he had lost significant time from work due to PTSD. Consequently, the evidence prior to September 29, 2014 does not more nearly approximate occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.

A rating in excess of 70 percent is not warranted at any time during the appeal period for PTSD because the evidence does not show PTSD symptomatology indicative of functional impairment equivalent to that for a 100 percent rating. The Veteran has worked at least part-time throughout the appeal period, and there has been no demonstration that his PTSD symptoms are productive of functional impairment comparable to the criteria for a 100 percent schedular rating. In fact, when examined by VA in December 2014, the examiner concluded that the Veteran's psychiatric symptoms resulted in occupational and social impairment with reduced reliability and productivity, which is indicative of a 50 percent rating under the rating schedule. The Veteran's symptomatology does not include most of the findings indicative of total occupational and social impairment, such as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Consequently, the manifestations of the Veteran's service-connected PTSD are not productive of functional impairment comparable to the criteria for a 100 percent schedular rating. 

Finally, the Board finds that the preponderance of the evidence weighs against the increased rating claim for PTSD. Consequently, the benefit-of-the-doubt rule does not apply, and entitlement to an initial evaluation in excess of 50 percent prior to September 29, 2014 and in excess of 70 percent beginning September 29, 2014 for PTSD is denied. See 38 U.S.C.A. § 5107(b) ; 38 C.F.R. §§ 3.102 ; 4.3; Gilbert, 1 Vet. App. at 55. 


Headaches

Service connection for tension-type headaches was granted in a March 2009 rating decision, and a 0 percent initial disability rating was assigned effective August 30, 2006. A February 2014 rating decision granted a 10 percent rating effective August 30, 2006 and a 30 percent rating effective January 3, 2011 for headaches. A February 2015 rating decision reduced the rating assigned for headaches to 0 percent effective December 18, 2014.

The Board notes that there was no need to follow the notice provisions applicable to reductions under 38 C.F.R. § 3.105 because the reduction did not result in any loss of compensation currently being made at the time of the reduction. In addition, even though the Board is increasing the Veteran's headache disability rating to 50 percent prior to December 18, 2014, and then the reduction being implemented would result in a reduction, there is still no need to meet the specific notice requirements of 38 C.F.R. § 3.105 because the Veteran was not currently receiving compensation at the 50 percent level for headaches at the time the reduction was implemented by the RO.

The Veteran's service-connected migraine headaches are currently evaluated under the provisions of 38 C.F.R. § 4.124a, Diagnostic Code 8100.

Under Diagnostic Code 8100, a 0 percent disability rating is assigned for less frequent attacks than for a 10 percent rating; a 10 percent evaluation is warranted for migraines with characteristic prostrating attacks averaging one in two months over the last several months; a 30 percent evaluation is warranted for migraines with characteristic prostrating attacks occurring on an average once a month over the last several months; and the maximum 50 percent evaluation is warranted for migraines with very frequent completely prostrating and prolonged attacks, productive of severe economic inadaptability. Id. 

The use of the conjunctive "and" in a statutory provision means that all of the conditions listed in the provision must be met. See Melson v. Derwinski, 1 Vet. App. 334 (1991); compare with Johnson v. Brown, 7 Vet. App. 95 (1994) (holding that only one disjunctive "or" requirement must be met in order for an increased rating to be assigned). Here, because of the successive nature of the rating criteria, such that the evaluation for each higher disability rating includes the criteria of each lower disability rating (at least what could be considered most of them), each of the criteria listed in the 50 percent rating must be met in order to warrant such a rating. See Tatum v. Shinseki, 23 Vet. App. 152, 156 (2009).

The term "productive of severe economic inadaptability" is not defined by VA regulations. However, the Court has stated that this term is not synonymous with being completely unable to work and that the phrase "productive of" could be read to mean either "producing" or "capable of producing" economic inadaptability. See Pierce v. Principi, 18 Vet. App. 440, 446-47 (2004).

The rating criteria do not define "prostrating" nor has the Court of Appeals for Veterans Claims. Cf. Fenderson, 12 Vet. App. at 126-127 (quoting Diagnostic Code 8100 verbatim but not specifically addressing the definition of a prostrating attack). By way of reference, in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1554 (31st Ed. 2007), "prostration" is defined as "extreme exhaustion or powerlessness."

When provided a neuropsychological evaluation by Dr. MacInnes in July 2008, the Veteran complained that he had had headaches almost daily since he was injured in a blast explosion in service. He took 800 mg of ibuprofen once or twice a day. 

On VA traumatic brain injury (TBI) evaluation in August 2008, the Veteran complained of migraine headaches 4-5 times a week, for which he was taking Motrin as needed. His headaches were described as non-prostrating. The diagnoses were no evidence of concussion-type residuals; tension-type headaches due to PTSD; benign positional vertigo, idiopathic. His headaches were reported to have no significant effect on his occupation or daily activities.

According to a log book the Veteran keep on his headaches, dated from May 24 to September 1, 2009, the Veteran had continued problems with headaches.

The Veteran was provided a VA neurological evaluation related to his headaches in March 2010. The Veteran complained of daily headaches, for which he was taking Motrin. He said that his headaches had gotten progressively worse. Although there were times when he had to lay down for 3-4 hours, most of the time he could carry on with his normal activities. His headaches were not prostrating. It was noted that his headaches had a significant effect on his occupation because of pain. Tension headaches were diagnosed.

A VA TBI evaluation was conducted in January 2011. The Veteran complained of daily headaches, which he described as severe a couple of times a month. He complained of problems with memory loss and concentration. He described periods of spinning that took him down for 3-4 days about 2-3 times a year. It was noted that the Veteran was a real estate appraiser who worked part-time. He had lost approximately six weeks in the previous year from work due to his headaches because they got so bad that he could not function. The examiner concluded that the Veteran did not meet the criteria for a diagnosis of TBI.

According to a December 2014 Disability Benefits Questionnaire, the Veteran reported that his headaches started in the back of his head; it is in the frontal area on the right. It affects his vision and usually lasts about 2-3 hours. He got tension-type headaches 3-4 times a week and migraines once a week; he usually took two 800 mg tablets of Motrin to relieve his headaches. He felt that his headaches had gotten worse over the past 3-4 years. The Veteran's headaches were not considered prostrating. A CT scan of the head did not show intracranial hemorrhage or acute large vessel territorial infarction. It was noted that the Veteran's headache disability did not impact his ability to work as a real estate appraiser.
Based on the above evidence, the Board finds that the Veteran's headache disability more nearly approximates the symptomatology for a 10 percent rating beginning December 18. 2014. Although it was reported on VA evaluation in December 2014 that the Veteran's headaches were not prostrating, he reported that his headaches had gotten worse over the previous 3-4 years, that they affected his vision, and that he had tension and migraine-type headaches approximately 5 days a week. A rating in excess of 10 percent is not warranted prior to January 3, 2011 or beginning December 18, 2014 because there is no evidence of monthly prostrating headaches during those periods. 

With respect to the period from January 3, 2011 through December 17, 2014, the Board finds it reasonable to conclude that the Veteran's headache symptomatology more nearly approximates very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability, warranting a 50 percent rating. He reported in January 2011 that he had daily headaches that became severe a couple of times a month. He was only working part-time, and he complained that he had periods of spinning that took him down for 3-4 days about 2-3 times a year. He also reported that he had lost 6 weeks of work during the previous year due to headaches because they got so bad that he could not function. This 50 percent rating is the maximum schedular rating provided for headaches under Diagnostic Code 8100. 

Additional Considerations

The Board has also considered whether the Veteran's claims should be referred for an extraschedular rating for PTSD or headaches. See 38 C.F.R. § 3.321(b) (2012); Thun v. Peake, 22 Vet. App. 111, 114 (2008). Because the ratings provided under the VA Schedule for Rating Disabilities are averages, it follows that an assigned rating may not completely account for each individual Veteran's circumstances, but nevertheless would still be adequate to address the average impairment in earning capacity caused by the disability. Thun, 22 Vet. App. at 114. However, in exceptional situations where the rating is inadequate, it may be appropriate to refer the case for extraschedular consideration. Id. The governing norm in these exceptional cases is a finding that the disability at issue presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards. 38 C.F.R.
§ 3.321(b)(1).

In this case, the Board finds that referral for extraschedular consideration is not warranted. As shown in the above discussions, the symptoms of the Veteran's service-connected PTSD and headaches are contemplated by the rating criteria. See Thun, 22 Vet. App. at 115. Accordingly, a comparison of the Veteran's symptoms and functional impairment with the schedular criteria does not show that the Veteran's PTSD presents "such an exceptional or unusual disability picture . . . as to render impractical the application of the regular schedular standards." 38 C.F.R. § 3.321(b). 

Consequently, the Board finds that the available schedular evaluations are adequate to rate the disabilities. In the absence of this threshold finding, there is no need to consider whether there are "related factors" such as marked interference with employment or frequent periods of hospitalization. See Thun, 22 Vet. App. at 118-19 (holding that the Board's finding that the rating criteria were adequate to evaluate the claimant's disability was a sufficient basis for denying extraschedular consideration without regard to whether there was marked interference with employment). Therefore, referral for extraschedular consideration is not warranted. 

The Board also notes that under Johnson v. McDonald, 2013-7104, 2014 WL 3562218 (Fed. Cir. Aug. 6, 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all of the service-connected disabilities experienced. However, in this case, after applying the benefit of the doubt under Mittleider v. West, 11 vet. App. 181 (1998), there are no additional service-connected disabilities that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions.
ORDER

Entitlement to an initial evaluation in excess of 50 percent prior to September 29, 2014 and in excess of 70 percent beginning September 29, 2014 for PTSD is denied.

Entitlement to an initial evaluation in excess of 10 percent prior to January 3, 2011 is denied.

Entitlement to an initial evaluation of 50 percent from January 3, 2011 through December 17, 2014 for headaches is granted, subject to the controlling regulations applicable to the payment of monetary benefits.

Entitlement to an initial evaluation of 10 percent beginning December 18, 2014 for headaches is granted, subject to the controlling regulations applicable to the payment of monetary benefits.


REMAND

A review of the evidence reveals that although separate evaluations of the Veteran's service-connected PTSD and headaches were obtained in December 2014, there is no opinion on file on whether the Veteran's service-connected disabilities as a whole cause sufficient functional impairment to prevent him from securing or following a substantially gainful occupation. In Geib v. Shinseki, 733 F.3d 1350 (Fed. Cir. 2013), the Federal Circuit held that it was not necessary for VA to get an opinion in all TDIU claims as to the combined effects of the Veteran's service-connected disabilities. However, in this case, the Board finds that an opinion would be helpful to determine the functional impact of the Veteran's service-connected disabilities.

Accordingly, the case is REMANDED for the following actions:

1. The AMC/RO will schedule an examination with a vocational specialist to address the functional impact of the veteran's service-connected PTSD, hearing loss, tinnitus, and headaches as a whole. The examiner is asked to provide an opinion as to the functional effects that the Veteran's service-connected disabilities have on the Veteran's ability to secure or follow a substantially gainful occupation, consistent with the Veteran's educational and occupational background and experience. This opinion must be provided without consideration of his nonservice-connected disabilities or his age. A complete rationale for all opinions must be provided. 

2. After completing the above action, the AMC/RO will readjudicate the issue of entitlement to TDIU. If the benefit sought on appeal remains denied, the Veteran and his representative must be furnished a supplemental statement of the case and be given the opportunity to respond thereto. The appeal must then be returned to the Board for appellate review.

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



____________________________________________
ROBERT C. SCHARNBERGER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs